## 45722. MOON v. THE STATE.
(375 SE2d 442)

GREGORY, Justice.

The appellant, Larry Eugene Moon, was convicted by a jury in Catoosa County of murder and armed robbery. He was sentenced to death for the murder.[1]

At 10:30 p.m. on November 24, 1984, the victim, Ricky Callahan, drove a 1978 Ford LTD to a convenience store to purchase headache medicine for his wife. He never returned. His body was found the next morning in a chert pit, shot twice in the head.

Larry Moon left his motel room late in the evening of November 24, 1984, for the announced purpose of making a telephone call. He returned later, driving the victim's car. He removed approximately $60 from the victim's wallet, and discarded the wallet. Moon and his companion then drove to Chattanooga, Tennessee, where she left him.

On November 26, 1984, a 1980 Buick Riviera was stolen from the parking lot of a shopping mall in Decatur, Alabama. The Callahan car was discovered abandoned three miles west of Decatur, Alabama, on November 28, 1984.

On December 14, 1984, a 1982 Buick LeSabre was stolen from a parking lot in Oneida, Tennessee. The local police knew the owner and the car, and it was soon spotted in Oneida. After a high-speed chase through the surrounding countryside, the police apprehended the car and its driver, Larry Moon. A number of guns were recovered from the interior of the stolen automobile, including one later identified as the murder weapon in this case.

Soon after Moon's capture, the police recovered from another

---

[1] The crime was committed November 24, 1984. Moon fled the state. He was returned to Georgia from Tennessee on September 3, 1987, and this case was tried January 11 through 21, 1988. A motion for new trial was filed on February 3, 1988, and denied March 30, 1988. The case was docketed in this court on April 18, 1988, and oral arguments were heard June 27, 1988.

parking lot in Oneida the 1980 Buick Riviera that had been stolen in Decatur, Alabama. The keys to this car were found on Moon when he was arrested. Inside this car were cassette tapes that had been inside Callahan's Ford LTD before it was stolen.

At the sentencing phase of the trial, the state offered additional evidence about Moon's activities before and after Ricky Callahan was murdered.

On November 15, 1984, Moon shot and killed Jimmy Hutcheson at Brown's Tavern in Chattanooga, Tennessee. He left Chattanooga and went to Catoosa County, Georgia, where the Callahan homicide occurred on November 24, 1984. He returned to Chattanooga and at 3:00 a.m. on December 1, 1984, he robbed at gunpoint Peeper's Adult Bookstore in Chattanooga. While there, he kidnapped Terry Lee Elkins (who was a female impersonator). Moon drove back to Georgia on Interstate 75, left the interstate and drove fifteen miles into the country, stopped the car, and sodomized his captive by the side of the road, threatening to kill him if he refused to submit.

Moon returned his captive to Chattanooga, and drove to Gatlinburg, Tennessee. Shortly after midnight on December 2, 1984, Moon (still driving the Buick Riviera he had stolen in Alabama) offered a ride to Darryl Ehrlanger and her fiance Thomas DeJosa. She worked in a restaurant in Gatlinburg and had just gotten off work. Moon took them almost to their home outside of Gatlinburg, stopped the car, and tried to drag Ehrlanger out of the car. When DeJosa attempted to rescue her, Moon shot him. DeJosa ordered her to run into the woods. When she did, Moon fired several shots at her. He then shot DeJosa three more times and left. By the time Ehrlanger reached DeJosa, he was dead.

On December 7, 1984, Moon was back in Chattanooga, where he robbed at gunpoint a convenience store owned by Ray York, taking over $900 from the store as well as the owner's billfold and his .357 magnum pistol. The pistol was recovered from inside the car Moon was driving when he was arrested.

1. The court did not deliver one of Moon's requested charges on circumstantial evidence. However, the principles of the requested charge were covered in substance by the charge delivered by the trial court. The refusal to give the exact language of Moon's request was not error. *Price v. State*, 180 Ga. App. 215 (2) (348 SE2d 740) (1986). As the court's charge covered the principles of the requested charge, Moon was not misled to his detriment by the court's somewhat ambiguous indication that the requested instruction would be given. Compare *Goins v. State*, 177 Ga. App. 536 (339 SE2d 790) (1986).

2. From the time of his arrest until shortly before this trial, Moon remained in Tennessee while some of the criminal charges pending there were disposed of. In February of 1987, Moon was transferred to

Brushy Mountain State Penitentiary in Petros, Tennessee, to begin serving a life sentence. The district attorney in this case filed detainers and a "Request for Temporary Custody" under the Interstate Agreement on Detainers (IAD). See OCGA § 42-6-20 et seq. Tennessee authorities suggested that since the death penalty was being sought in the Catoosa County case, Georgia should pursue Moon's return by means other than the IAD. An executive agreement was signed by the governors of Tennessee and Georgia providing for Moon's return and providing that if Moon did not receive a death sentence, Moon should be returned to Tennessee following the conclusion of the Georgia proceedings. Moon contested his extradition until August of 1987. Thereafter, on August 21, 1987, while Moon was still in Tennessee, the trial judge and the attorneys in this case met to discuss a date for trial. After allowing for time to dispose of the many anticipated pre-trial motions and resolving schedule conflicts, the parties agreed to a tentative trial date of January 11, 1988. Although Moon's attorney indicated at this hearing that Moon's presence would not be necessary for a month or two, he soon obtained an ex parte order for Moon's immediate return to Georgia. Moon was brought into Georgia on September 3, 1987. On January 5, 1988, Moon's attorneys filed a motion to dismiss for failure to try him within 120 days of his return to Georgia pursuant to the provisions of the IAD. He now contends the trial court erred by denying his motion to dismiss.

(a) The IAD is "a congressionally sanctioned interstate compact the interpretation of which presents a question of federal law." *Cuyler v. Adams*, 449 U. S. 433, 442 (101 SC 703, 66 LE2d 641) (1981).

> The central provisions of the Agreement are Art. III and Art. IV. . . .
>
> Article IV provides the means by which a prosecutor who has lodged a detainer against a prisoner in another state can secure the prisoner's presence for disposition of the outstanding charges. Once he has filed a detainer against the prisoner, the prosecutor can have him made available by presenting to the officials of the state in which the prisoner is incarcerated a "written request for temporary custody or availability. . . ."

*United States v. Mauro*, 436 U. S. 340, 351 (98 SC 1834, 56 LE2d 329) (1978).

If a prosecutor uses Article IV to obtain a prisoner from another state,

> trial shall be commenced within one hundred and twenty days of the arrival of the prisoner in the receiving state, but

for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance.

OCGA § 42-6-20 (Art. IV (c)).

(b) The state argues that the IAD does not apply because it abandoned its attempt to obtain the defendant through the IAD and instead obtained his return by executive agreement and extradition. However, it is not clear that the provisions of the IAD can be avoided once a detainer is filed. Compare *United States v. Mauro*, supra. See also *United States v. Roy*, 771 F2d 54 (2nd Cir. 1985); *State ex rel. Bailey v. Shepard*, 584 F2d 858, 862 (8th Cir. 1978). We need not decide this issue, however. Although the state may not ignore the 120-day limit in Article IV of the IAD, the trial court may grant any "necessary *or* reasonable continuance." Moreover, the 120-day limit may be "tolled whenever and for so long as the prisoner is unable to stand trial," OCGA § 42-6-20 (Art. VI (a)), and this language has been interpreted to " 'exclude all those periods of delay occasioned by the defendant.' *United States v. Scheer*, 729 F2d 164, 168 (2nd Cir. 1984)." *United States v. Roy*, supra at 59. Finally, the rights created by the IAD are "nonjurisdictional and waivable." *Kowalak v. United States*, 645 F2d 534, 536 (6th Cir. 1981). Since the IAD guarantees are of statutory rather than constitutional proportions, "a defendant need not know of the Act to effectively waive its provisions," *United States v. Odom*, 674 F2d 228, 230 (4th Cir. 1982), and waiver may be shown by agreeing to a trial date set outside the 120-day limit. *United States v. Hines*, 717 F2d 1481 (4th Cir. 1983).

In this case, a trial date was set with the agreement of the defendant's attorney. Thereafter, Moon was returned to Georgia earlier than anticipated, and then filed over 60 motions, which necessarily had to be determined before trial. Compare *United States v. Scheer*, supra at 168-9. Moon did not raise any objections to the date set for trial until one day after the 120-day period had elapsed. In these circumstances, Moon cannot now complain that the state missed by one week beginning his trial within 120 days of his return to Georgia.[2]

(c) Moon contends that under the IAD he must be returned to Tennessee to complete his sentences there before his sentence of death can be carried out in Georgia. He seeks the invalidation of the aforementioned "Executive Agreement" which provides otherwise.

Article V (e) of the IAD provides: "At the earliest practicable

---

[2] The 120-day period ended on Friday, January 1—a holiday. The first business day after January 1 was Monday, January 4. Moon concedes the 120-day limitation would not have been violated if the trial had begun on January 4. It did begin on January 11, exactly one week later.

time *consonant with the purposes of this agreement,* the prisoner shall be returned to the sending state." (Emphasis supplied.)

The IAD sets forth its purpose in Article I, noting that since

charges outstanding against a prisoner, detainers based on untried indictments, informations or complaints, and difficulties in securing speedy trial of persons already incarcerated in other jurisdictions, produce uncertainties which obstruct programs of prisoner treatment and rehabilitation,

the contracting states agree

it is the policy of the party states and the purpose of this agreement to encourage the expeditious and orderly disposition of such charges. . . .

A "further purpose" of the IAD is to provide "cooperative procedures" to carry out the Act's policies.

Moon contends the IAD requires his return to Tennessee, without exception or qualification. We disagree. Moon's trial provided the "expeditious and orderly disposition" of the charges underlying the detainer, and since Moon now is under a death sentence, he has no recognizable interest in "programs of prisoner treatment and rehabilitation." The states of Georgia and Tennessee have by "cooperative procedures" agreed that Moon should stay in Georgia if a death sentence was imposed in this case, and we find nothing in the IAD that requires the invalidation of this agreement.

(d) Any issue concerning the denial of a pre-trial appeal of any IAD issue is now moot.

(e) The trial court did not err by denying the defendant's motion to disqualify the district attorney for conflict of interest where the only conflict of interest alleged was that the district attorney might be civilly liable to the defendant for violating his rights under the IAD. Compare *Williams v. State*, 258 Ga. 305 (2) (368 SE2d 232) (1988).

3. The jury found as a statutory aggravating circumstance that the offense of murder in this case was committed by a person with a record of conviction for three capital felonies: (a) The armed robbery of Ray York; (b) the armed robbery of Peeper's Bookstore; and (c) the kidnapping with bodily injury of Terry Lee Elkins. See OCGA § 17-10-30 (b) (1). Moon contends this finding was invalid because he was convicted for these crimes in Tennessee.

The § b (1) statutory aggravating circumstance may be established by proof of out-of-state convictions that, as here, clearly are comparable to Georgia capital felony offenses. See *Cobb v. State*, 244 Ga. 344 (20) (260 SE2d 60) (1979). The § b (1) finding is supported beyond a reasonable doubt by the evidence, which included not only

copies of the convictions, but also testimony from the victims of the crimes.

4. The jury also found that the offense of murder in this case was committed while the offender was engaged in the commission of the armed robbery of Ricky Callahan. See OCGA § 17-10-30 (b) (2). Moon contends this circumstance fails to narrow the class of persons eligible for a death sentence where a defendant is convicted of both murder and armed robbery. This contention is without merit, for reasons set forth in *Ford v. State*, 257 Ga. 461 (1) (360 SE2d 258) (1987).

The § b (2) finding is supported by the evidence beyond a reasonable doubt. OCGA § 17-10-35 (c) (2).

5. Viewing the evidence in the light most favorable to the state, any rational trier of fact could have found Moon guilty beyond a reasonable doubt of the offenses of murder and armed robbery. The evidence supports the conviction for murder and armed robbery. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

6. Moon's two appointed attorneys complain they were inadequately compensated for trying this case. Absent any proof that, as a result of inadequate compensation, Moon was denied effective assistance of counsel, attorney fees are not properly in issue on this appeal. Compare *In re Whatley*, 256 Ga. 289 (347 SE2d 602) (1986).

7. Where a competent witness is sworn properly and testifies before the grand jury, and where the defendant is thereafter found guilty beyond a reasonable doubt by a trial jury, the sufficiency of the evidence to support the indictment is not open to question. *Felker v. State*, 252 Ga. 351 (2 a) (314 SE2d 621) (1984).

Nor is it a ground to dismiss the indictment that police officers are on the grand jury *list*, but not on the grand jury which returned the indictment, even if we were to agree that police officers should not serve on the grand jury. Compare *Narramore v. State*, 181 Ga. App. 254 (351 SE2d 643) (1986).

Moon has not shown any unconstitutional discrimination in the selection of grand jury forepersons in Catoosa County. *Ingram v. State*, 253 Ga. 622 (1 c) (323 SE2d 801) (1984).

Absent proof that any cognizable group was underrepresented on the grand jury list, the mere fact that the jury commissioners exercised their subjective judgment in selecting names for the list provides no ground for challenge to the list. *Parks v. State*, 254 Ga. 403 (6) (330 SE2d 686) (1985).

8. The trial court did not err in denying the defendant's motion for pre-trial discovery of the state's juror information records. *Wansley v. State*, 256 Ga. 624 (2) (352 SE2d 368) (1987). The court was within its discretion to allow the district attorney to ask the statutory voir dire questions set forth in OCGA § 15-12-164. *Hicks v. State*, 232 Ga. 393, 400 (207 SE2d 30) (1974).

9. The trial court's death-qualification rulings are " 'within the deference due the trial judge's determination.' *Jefferson v. State*, 256 Ga. 821, 824 (353 SE2d 468) (1987)." *Childs v. State*, 257 Ga. 243 (7) (357 SE2d 48) (1987). Moon's voir dire examination was not improperly restricted. *Curry v. State*, 255 Ga. 215 (2 b) (336 SE2d 762) (1985).

10. The prosecutor used one of his ten peremptory challenges to strike a black prospective juror. Moon claims this establishes a prima facie case under *Batson v. Kentucky*, 476 U. S. 79 (106 SC 1712, 90 LE2d 69) (1986). Since Moon is white, he lacks standing to complain of the prosecutor's peremptory challenge of a black juror. *Skipper v. State*, 257 Ga. 802 (5) (364 SE2d 835) (1988).

11. Prospective juror Walker was excused for cause, based on his knowledge of the case (including the defendant's criminal record and other pending charges) and his bias in favor of a death sentence. He was then sworn as a bailiff.

(a) Moon contends that Walker's knowledge of the case and his attitudes about the death penalty disqualified him to serve as bailiff. This contention is without merit. See *Hannah v. State*, 212 Ga. 313, 323-4 (92 SE2d 89) (1956).

(b) One evening during the trial, Walker developed chest pains which were not relieved by his medicine. One of the jurors (a nurse) persuaded him that he should go to the emergency room. This juror and another drove Walker to the hospital. Walker remained fully conscious at all times and the two jurors never left his sight. The jurors did not discuss the case with anyone, including Walker. The situation was brought to the court's attention the next morning. The court offered to excuse both jurors and replace them with alternates, but only if the defendant accepted the offer before the parties or the court learned the identity of the two jurors. Otherwise, the court would excuse the two jurors only if their testimony or that of the bailiff showed any improper communications. The defendant's attorneys declined the offer to excuse, but moved for a mistrial, which the court denied.

The testimony presented at the hearing on this issue showed no violation of jury sequestration or improper communication, and the trial court did not err by denying the motion for a mistrial, especially after the defendant declined the opportunity to remove the two jurors.

(c) Moon also complains the trial court erred by sequestering the jury overnight in East Ridge, Tennessee. There are only two motels in Catoosa County. After the jury complained of its accommodations at one of them, the trial court found conditions at this motel to be "deplorable" and conditions at the other to be even worse. The court announced to the parties that he intended to sequester the jury in a

motel six miles away in East Ridge, Tennessee. Attorneys for both sides *and* the defendant responded that they had no objection to the out-of-state sequestration. In these circumstances, no error has been shown. Compare *Jones v. State*, 243 Ga. 820 (3) (256 SE2d 907) (1979)

(d) No other violation of jury sequestration has been shown. *Jones v. State*, 258 Ga. 96 (366 SE2d 144) (1988).

12. (a) The trial court did not abuse its discretion as to the number of guards in the courtroom during the trial. *Spivey v. State*, 253 Ga. 187 (12) (319 SE2d 420) (1984).

(b) After Moon misbehaved the evening of the first day of the penalty phase of the trial, the trial court ordered that Moon's legs be shackled for the remainder of the trial. The defendant's attorney objected to his being shackled, stating that although the shackles were hidden from the view of the jury while in the jury box, the shackles would be visible to the jury as it entered the back door of the courtroom.

Relying on *Elledge v. Dugger*, 823 F2d 1439 (VI) (11th Cir. 1987), Moon now argues the trial court erred by shackling him without a hearing and that his death sentence should be reversed.

In *Elledge v. Dugger*, as here, the trial judge received information from security personnel regarding the defendant's behavior, and ordered the defendant shackled during the sentencing proceedings. However, unlike here, "Elledge was denied the required procedure when the court refused him an adequate opportunity to challenge the untested information that served as the basis for the shackling." *Elledge v. Dugger*, supra at 1451.

In this case, the defendant's attorney raised the issue of shackling briefly during the course of a hearing on another matter outside the presence of the jury, while the parties were waiting for a witness to enter the courtroom. The entire discussion of the issue fills just over two pages of the transcript. The defendant did not request a hearing, or attempt to refute the information on which the court acted.

In these circumstances, the defendant may not now complain that he was denied "an adequate opportunity" to be heard on the issue, or that his shackling was unnecessary.

13. Evidence regarding Moon's theft of two automobiles following the murder of Ricky Callahan was properly admitted. In each case, a car was stolen from the same area in which the previous car was abandoned, and this evidence directly connected Moon to the theft and abandonment of the Callahan car. Compare *Ingram v. State*, 253 Ga. 622 (6) (323 SE2d 801) (1984).

14. The court did not err by denying the defendant's motion for change of venue. *Lee v. State*, 258 Ga. 82 (9) (365 SE2d 99) (1988).

15. Before charging the jury at the penalty phase of the trial, the

court apologized for the delay, explaining that the charge was part of the case which "not only do you look at, but the appellate court looks at, and so, it must be in proper form and comply with the law in all respects." Although Moon did not object at trial to this comment, he now argues the comment could have had the "same effect" as the prosecutor's argument in *Caldwell v. Mississippi*, 472 U. S. 320 (105 SC 2633, 86 LE2d 231) (1985). In *Caldwell*, the prosecutor, with the agreement of the trial judge, informed the jury that it need not feel responsible for its verdict, as it would be reviewed by the appellate courts. Given the limited nature of appellate review, this argument was misleading, and was condemned by the U. S. Supreme Court as designed to diminish the jury's perception of its responsibility to reach a just verdict.

The comment in this case did not imply that anything other than the court's charge would be reviewed, and the jury was specifically instructed that its verdict would be carried out and that the court had "no power to reduce your sentence in any way." There was no reversible error. Compare *Fleming v. State*, 240 Ga. 142 (240 SE2d 37) (1977).

16. In a death penalty case, the prosecution may not introduce in aggravation a "victim impact statement" setting forth in detail the impact of the crime on the victim's family. *Booth v. Maryland*, _____ U. S. _____ (107 SC 2529, 96 LE2d 440) (1987). On the other hand,

> [t]he fact that there is a victim, and facts about the victim properly developed during the course of the trial, are not so far outside the realm of "circumstances of the crime" that mere mention will always be problematic.

*Brooks v. Kemp*, 762 F2d 1383, 1409 (11th Cir. 1985). We do not find a violation of *Booth* here, either in the introduction of the evidence or in the state's argument. Compare *Holiday v. State*, 258 Ga. 393 (11 f) (359 SE2d 900) (1988).

The trial court did not err in denying the defendant's motion for mistrial when two state's witnesses became emotional during their testimony. Compare *Duncan v. State*, 256 Ga. 391 (2) (349 SE2d 699) (1986).

17. Byers (Moon's companion living with him at the time of the crime) testified at trial about her traffic arrest for improper tags. She explained that because she was driving a borrowed car at the time, she never went to trial on these charges. Since this information was revealed at trial, no *Brady* violation occurred. See *Parks v. State*, 254 Ga. 403 (3) (330 SE2d 686) (1985). There is no evidence that the testimony of this witness was procured by the dismissal of a minor traffic violation. See *Giglio v. United States*, 405 U. S. 150 (92 SC 763, 31

LE2d 104) (1972).

Moon also raises the possibility of a "deal" to dispose of a DUI charge against Byers' present husband. The record shows the husband was charged by the city of Fort Oglethorpe with the offense of DUI in 1985 and then inadvertently recharged with the same DUI in 1986. The latter charge was dropped. Even if anyone involved in the prosecution of this case had been aware of the disposition of a DUI charge against someone who did not testify in this case (and the record shows none were), no "deal" has been shown.

18. Moon has no standing to complain of the search of stolen automobiles that he did not own. *Sanborn v. State*, 251 Ga. 169 (1) (304 SE2d 377) (1983).

19. The court did not err in the admission of selected photographs of the victim's body. *Hicks v. State*, 256 Ga. 715 (13) (352 SE2d 762) (1987).

20. There was no error in the admission of cassette tapes recovered from one of the stolen cars and identified by the victim's mother as hers. *Kates v. State*, 152 Ga. App. 29 (2) (262 SE2d 221) (1979).

21. There was no reversible error in the admission of documentary evidence of ownership of automobiles stolen by the defendant. *Hawkins v. State*, 185 Ga. App. 837 (2) (366 SE2d 222) (1988).

22. Before a ballistics expert testified, Moon objected that he had not been served with a summary of the expert's report, as required by OCGA § 17-7-211. The state contended that the defense had, in fact, been properly served. The trial court conducted a hearing on the issue (outside the presence of the jury) and found that the report had been properly served. This finding is supported by the record. The trial court did not err by allowing the state to call the lead defense attorney as a witness during this hearing. Unlike the attorney in *Almond v. State*, 180 Ga. App. 475 (1) (349 SE2d 482) (1986), the attorney here was not required to reveal information protected by the attorney-client relationship.

23. There was no error in the admission in evidence of the victim's clothing. *Smith v. State*, 255 Ga. 685 (2) (341 SE2d 451) (1986).

24. "It has been repeatedly held that it is within the discretion of the trial judge to permit a witness to remain in the courtroom to assist either the State or the accused." *Benton v. State*, 9 Ga. App. 291 (6) (71 SE 8) (1911). Since the defendant raised no issue at trial about the order of testimony, there was no error in not requiring the excepted witness to testify first. *McGruder v. State*, 213 Ga. 259 (9) (98 SE2d 564) (1957).

25. There is no evidence that a reward fund was established or that any guilt-phase witness was given immunity in exchange for his testimony. The trial court properly refused to give Moon's requests to charge concerning these issues at the guilt phase of the trial.

26. The court's charge defining the offense of armed robbery covered the subject, and the court did not err by refusing to give Moon's requested charge on the same subject. *Jones v. State*, 258 Ga. 25 (4) (365 SE2d 263) (1988).

27. The court did not err by giving a charge concerning a permissible inference of guilt from recent possession of stolen property. *Bankston v. State*, 251 Ga. 730 (309 SE2d 369) (1983).

28. The state procured one of its witnesses from Tennessee by means of the Uniform Act to Secure the Attendance of witnesses From Without the State. OCGA § 24-10-90 et seq. Even if, as Moon contends, there were some procedural irregularities involved in obtaining the witness, we do not agree that Moon has standing to complain of them.

The state was entitled to bolster this witness on redirect examination by proving prior consistent statements after the defendant raised an issue of recent fabrication on cross-examination. *Cuzzort v. State*, 254 Ga. 745 (334 SE2d 661) (1985).

29. The state offered evidence at the sentencing phase of the trial establishing that Moon murdered Jimmy Hutcheson and, in two later incidents, forcefully sodomized Terry Elkins and murdered Tommy DeJosa. Tennessee has dismissed the indictment charging the murder of Hutcheson, and the DeJosa case has not yet been brought to trial. Moon was tried in Tennessee for the kidnapping and "aggravated rape" of Elkins (as well as for the armed robbery of the bookstore where the kidnapping took place).[3] He was convicted of armed robbery and aggravated kidnapping, but the aggravated rape charge was dismissed by directed verdict because it occurred in Georgia and the Tennessee court lacked jurisdiction over the offense.

Moon argues the court should have excluded evidence concerning crimes for which he has not been convicted.

(a) The lack of a conviction standing alone is no ground to exclude evidence in aggravation. The state may prove in aggravation crimes for which the defendant has not been convicted. *Devier v. State*, 253 Ga. 604 (9) (323 SE2d 150) (1984).

(b) The dismissal before trial of the indictment charging Moon with the murder of Jimmy Hutcheson did not resolve any facts in the defendant's favor. The defendant may still be prosecuted for this crime, as he has not yet been placed in jeopardy. *Shaw v. State*, 239 Ga. 690 (1) (238 SE2d 434) (1977).

Likewise, the directed verdict on the aggravated rape charge resolved in Moon's favor only the question of jurisdiction. It did not

---

[3] In contrast to Tennessee law, Georgia law defines rape as an offense that can be committed only against a female. OCGA § 16-6-1. The offense characterized as an aggravated rape in Tennessee would amount to an aggravated sodomy here. OCGA § 16-6-2.

resolve in his favor whether or not he forced Elkins to submit to an act of anal sex, and collateral estoppel did not preclude the state's proof of this crime at the penalty phase of this trial. *Morgan v. State*, 257 Ga. 596 (1) (361 SE2d 793) (1987); *Fugitt v. State*, 256 Ga. 292 (1 d) (348 SE2d 451) (1986).

30. The court granted the defendant's pretrial motion to conduct a hearing outside the presence of the jury to determine before Elkins testified whether the evidence sufficiently established that Moon had committed the offense of aggravated sodomy. However, the court inadvertently overlooked this procedure. The defendant did not object to the failure to conduct a preliminary hearing, and, in any event, since Elkin's testimony plainly established the offense, any error is harmless.

31. The state also introduced in aggravation certified copies of Tennessee convictions based on guilty pleas showing the commission by Moon of seven burglaries, three aggravated assaults, one shoplifting offense, and one escape. Moon objected to the admission of these offenses on the ground that the certified copies failed to show compliance with Tennessee law as set forth in *Rounsaville v. Evatt*, 733 SW2d 506 (Tenn. 1987), applying a stricter standard for the entry of a guilty plea than mandated by the U. S. Supreme Court in *Boykin v. Alabama*, 395 U. S. 238 (89 SC 1709, 23 LE2d 274) (1969), and that the convictions therefore may be invalid.

The defendant suggests the recently-decided case of *Johnson v. Mississippi*, ___ U. S. ___ (108 SC 1981, 100 LE2d 575) (1988), is relevant here. Johnson was sentenced to death in Mississippi based on the jury's finding of three statutory aggravated circumstances, one of which was supported solely by proof of a New York conviction which was reversed on appeal *after* the Mississippi case was tried. The U. S. Supreme Court held that the aggravating circumstance based on this conviction could not stand.

The U. S. Supreme Court did not foreclose a harmless error analysis in a case where a conviction later set aside was used in aggravation of sentence. We note that in contrast to the situation in *Johnson v. Mississippi*, the evidence complained of here was not used to establish a statutory aggravating circumstance. More importantly at this point, the convictions complained of here have *not* been set aside, and it is not inevitable that they will be. See *Housler v. State*, 749 SW2d 758 (Tenn. Ct. App. 1988). It was not reversible error to use these convictions in aggravation.

32. The trial court did not err by excluding from evidence the American mortality tables. Cf. *Horton v. State*, 249 Ga. 871 (4) (295 SE2d 281) (1982).

33. Although the trial court did not give Moon's requested charge

on residual doubt,[4] the court observed that the defense could argue residual doubt, and the court's charge left no doubt that the jury was not at all restricted in its consideration of mitigating circumstances. See *Davis v. State*, 255 Ga. 598 (22) (340 SE2d 869) (1986).

34. The court instructed the jury plainly and emphatically that its recommendation of sentence would be binding on the court. There was no error in the court's sentencing-phase charge.

35. During his closing argument, the prosecutor asked the rhetorical question, "What mercy, Mr. Defendant, did you show [the victim]. . .?" The defendant characterizes this portion of the argument as a comment on his failure to testify. We think it is more reasonably interpreted as an observation that Moon showed his victim no mercy. Such an argument is not improper. *Ford v. State*, 255 Ga. 81 (8 (i-2)) (335 SE2d 567) (1985).

In response to the defendant's argument that since all the murders occurred within a one-month period, the state was seeking to punish Moon based on one month of his life, the state argued:

> Now, granted, each of these occurred during that one month span of time. Does that make the victims feel better, the victim's families, the survivors of this man, does that make one bit of difference to them that it all occurred within a span of one month?

This response was simply "a compelling statement of the victim's death and its significance, relevant to the retributive function of the death penalty." *Brooks v. Kemp*, 762 F2d, supra at 1410. See also *Donnelly v. DeChristoforo*, 416 U. S. 637 (94 SC 1868, 40 LE2d 431) (1974).

36. There is no merit to the defendant's constitutional objections to the Unified Appeal Procedure. *Sliger v. State*, 248 Ga. 316 (282 SE2d 291) (1981). Moon has not shown any significant non-compliance with the Unified Appeal Procedure in this case.

37. Moon was not denied his right to a speedy trial, considering all the circumstances of this case. *Harrison v. State*, 257 Ga. 528 (2) (361 SE2d 149) (1987).

38. Any issue as to the court's ruling on the defendant's "Motion to Require Disclosure of Prosecution's Case and Work of State's Expert Witnesses" was rendered moot when the state opened its file to the defense three and one-half months before trial.

39. There is no merit to Moon's contention that OCGA § 17-10-30 is unconstitutional. *Ford v. State,* 257 Ga. 461 (1) (360 SE2d 258) (1987).

---

[4] See *Cook v. State*, 255 Ga. 565, 586 (fn. 11) (340 SE2d 843) (1986).

40. Death-qualification of prospective jurors is not unconstitutional. *Hicks v. State*, 256 Ga. 715 (10) (352 SE2d 762) (1987).

41. The jury requested that the trial continue through the weekend. Counsel for the defendant stated that trial on Sunday would not work an undue hardship on the defense. However, he now contends the court erred by conducting trial on Sunday.

As all the parties were present and consented to trying the case on Sunday, there was no error. Compare *Bass v. Irvin*, 49 Ga. 436, 438 (1873).

42. The death sentence was not imposed as the result of impermissible passion, prejudice, or other arbitrary factor. OCGA § 17-10-35 (c) (1). The sentence imposed in this case is neither excessive nor disproportionate to sentences imposed in similar cases, considering both the crime and the defendant. OCGA § 17-10-35 (c) (3). The similar cases listed in the Appendix support the imposition of a death sentence in this case.

*Judgment affirmed. All the Justices concur.*

### APPENDIX.

*Lee v. State*, 258 Ga. 82 (365 SE2d 99) (1988); *Harrison v. State*, 257 Ga. 528 (361 SE2d 149) (1987); *Childs v. State*; 257 Ga. 243 (357 SE2d 48) (1987); *Hicks v. State*, 256 Ga. 715 (352 SE2d 762) (1987); *Cook v. State*, 255 Ga. 565 (340 SE2d 843) (1986); *Beck v. State*, 255 Ga. 483 (340 SE2d 9) (1986); *Walker v. State*, 254 Ga. 149 (327 SE2d 475) (1985); *Ingram v. State*, 253 Ga. 622 (323 SE2d 801) (1984); *Spivey v. State*, 253 Ga. 187 (319 SE2d 420) (1984); *Roberts v. State*, 252 Ga. 227 (314 SE2d 83) (1984); *Mincey v. State*, 251 Ga. 255 (304 SE2d 882) (1983); *Jones v. State*, 249 Ga. 605 (293 SE2d 708) (1982); *Berryhill v. State*, 249 Ga. 442 (291 SE2d 685) (1982); *Solomon v. State*, 247 Ga. 27 (277 SE2d 1) (1981); *Dick v. State*, 246 Ga. 697 (273 SE2d 124) (1980); *Tucker v. State*, 245 Ga. 68 (263 SE2d 109) (1980); *Jones v. State*, 243 Ga. 820 (256 SE2d 907) (1979); *Amadeo v. State*, 243 Ga. 627 (255 SE2d 718) (1979); *Corn v. State*, 240 Ga. 130 (240 SE2d 694) (1977); *Young v. State*, 237 Ga. 852 (230 SE2d 287) (1976); *Stephens v. State*, 237 Ga. 259 (227 SE2d 261) (1976); *Spencer v. State*, 236 Ga. 697 (224 SE2d 910) (1976); *Pulliam v. State*, 236 Ga. 460 (224 SE2d 8) (1976); *Dobbs v. State*, 236 Ga. 427 (224 SE2d 3) (1976); *Goodwin v. State*, 236 Ga. 339 (223 SE2d 703) (1976); *Mitchell v. State*, 234 Ga. 160 (214 SE2d 900) (1975); *Moore v. State*, 233 Ga. 861 (213 SE2d 829) (1975).

DECIDED NOVEMBER 30, 1988 — RECONSIDERATION DENIED DECEMBER 14, 1988.

*Glen M. Vey*, for appellant.

*David L. Lomenick, Jr., District Attorney, David J. Dunn, Jr., Scott K. Camp, Assistant District Attorneys, Michael J. Bowers, Attorney General, Dennis R. Dunn, Assistant Attorney General,* for appellee.

